## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF CORSEAN LEWIS, deceased, | ) | |
| by MA'KIYA BRIMLEY, Independent | ) | |
| Administrator, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19 C 3466 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| CHICAGO POLICE OFFICER ALEXANDER | ) | |
| FUERTES, CHICAGO POLICE OFFICER | ) | |
| WASHINGTON MINA, and CITY OF | ) | |
| CHICAGO, a municipal corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

On the night of June 2, 2017, Defendant Chicago Police Officers Alexander Fuertes and

Washington Mina (the "Officers") shot and killed Corsean Lewis, a seventeen-year-old male.

Plaintiff Ma'Kiya Brimley, as the independent administrator of Lewis' estate (the

"Administrator"), filed this lawsuit against the Officers and the City of Chicago, bringing a 42

U.S.C. § 1983 claim against the Officers for excessive force and seeking indemnification from

the City under Illinois law for any judgment entered against the Officers. After completing

discovery, Defendants filed a motion for summary judgment. Because the evidence allows only

for the conclusion that the Officers acted in an objectively reasonable manner when firing at

Lewis, the Court enters judgment for Defendants.

# BACKGROUND[1]

## I.     The Shooting

On June 2, 2017, the Officers were on duty in the Washington Park neighborhood of Chicago, Illinois, wearing police uniforms, and traveling in an unmarked police car bearing "M plates." Doc. 83 ¶ 11.  At approximately 11:00 p.m., the Officers heard police dispatchers broadcast that a group of individuals wearing black and armed with guns were seen "heading southbound from 55th and Indiana." *Id.* ¶ 15.  Shortly thereafter, the Officers drove to the intersection of East 55th Place and South Indiana Avenue and drove around the streets adjacent to the intersection.  As Officer Fuertes drove westbound on East 58th Street, he testified that he saw multiple individuals toward the end of an alley between South State Street and South Wabash Avenue wearing dark clothing and standing underneath a streetlight.  Officer Fuertes turned left into the alley and once he did, Officer Mina testified that he also saw the individuals.

Officer Fuertes drove towards the individuals and when the Officers were approximately seventy-five feet from them, or about two to four houses away, Officer Mina testified that he saw one individual, later identified as Lewis, holding a gun near his right leg, the side facing the Officers.  Officer Fuertes testified that he then noticed Lewis facing the Officers and holding a gun in his right hand; in response, Officer Fuertes immediately parked the car.  Almost

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts, the Administrator's Additional Facts, Defendants' reply, and the exhibits attached to each.  The Court has included in this background section only those portions of these facts that are appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.  The Court takes all facts in the light most favorable to the Administrator, the non-movant.  The parties filed some exhibits under seal, also providing redacted versions.  When the Court refers to a sealed document, it attempts to do so without revealing any information that could reasonably be deemed confidential.  Nonetheless, if the Court discusses confidential information, it has done so because it is necessary to explain the path of its reasoning.  *See City of Greenville v. Syngenta Crop Prot., LLC*, 764 F.3d 695, 697 (7th Cir. 2014) ("[D]ocuments that affect the disposition of federal litigation are presumptively open to public view . . . unless a statute, rule, or privilege justifies confidentiality." (citation omitted)); *Union Oil Co. of Cal. v. Leavell*, 220 F.3d 562, 568 (7th Cir. 2000) (explaining that a judge's "opinions and orders belong in the public domain").

simultaneously, Officer Mina testified that Lewis looked towards the Officers and began walking toward their car in a crouched stance, with his knees slightly bent, somewhat hunched over, and with the gun still at his side, pointed at the ground. Officer Fuertes also testified that Lewis began slowly walking towards the Officers while looking directly at them and holding a gun by his side.

In response, the Officers testified that they pulled their guns from their holsters as they stepped out of the car, stood behind their respective car doors, pointed their guns at Lewis, and yelled, "police, drop the gun" multiple times. *Id.* ¶ 36. The Officers testified that in response, Lewis raised the gun towards them. Then, Officer Fuertes saw the muzzle of Lewis' gun flash and heard a gunshot, and Officer Mina heard gunshots coming from Lewis' direction. As a result, the Officers testified that they believed Lewis had shot at them. The Officers testified that they immediately returned fire at Lewis and as they continually shot at him, Lewis repeatedly fired at the Officers while moving toward the eastside of the alley. The Officers asserted that they stopped shooting once Lewis was out of sight and had also stopped shooting. In total, Officer Fuertes fired fifteen bullets and Officer Mina fired seven bullets. The shooting lasted only a few seconds, during which the Officers testified that they feared for their lives.

Officer Mina then reported "shots fired" on the police radio and the Officers slowly approached the area where they lost sight of Lewis with their guns drawn. Doc. 83-3 at 33. The Officers found Lewis on the ground near a car parked in a vacant lot meant for a garage on the eastside of the alley, later identified as the rear of 5834 S. Wabash Avenue. Officer Mina explained that when the Officers were near their car, a garage had obscured Lewis from the Officers' sight. Officer Mina testified that he saw Lewis crawling towards the car, and Officer Fuertes testified that he saw Lewis underneath the car, lying on top of one of his hands. The

Officers testified that they could not tell at that point whether Lewis still had the gun, so they repeatedly instructed him to "show me [your] hands" or "let me see your hands" and remained focused on him. Doc. 83-3 at 33; Doc. 83-2 at 27. Once additional police officers arrived and secured Lewis, the Officers testified that they noticed a semiautomatic gun near the car, a short distance from Lewis. Officer Mina testified that he believed it was the same gun he had seen Lewis holding. Officer Fuertes testified that he immediately instructed the other police officers on the scene to guard the gun and Officer Mina testified that he instructed the officers not to touch the gun. An ambulance transported Lewis to John H. Stroger, Jr. Hospital where a doctor pronounced him dead at 11:54 p.m. on June 2, 2017.

At the time of the shooting, Claudette McIntosh and Alex Spates were in McIntosh's backyard located at 5830 S. Wabash Avenue. Shortly after the shooting, McIntosh told an investigator from the Independent Police Review Authority ("IPRA") that she saw the Officers' car drive into the alley from the north and then heard it stop abruptly behind the house next door. McIntosh could not see the Officers but heard them get out of the car. She said she could not understand what the Officers said when they first got out but said it "sounded like a confrontation" and that they spoke very fast. Doc. 98 at 28. Next, McIntosh heard the Officers repeatedly say "put the gun down" and then heard gunshots fired closely together, in one volley and in rapid succession. *Id.* McIntosh did not see to whom the Officers spoke or who fired the gunshots but said the only gunshots she heard came from the direction of the Officers' car. Seconds later, McIntosh saw the Officers, dressed in uniform, slowly walking south down the alley, past her home, with their guns drawn and repeatedly saying, "let me see your hands." *Id.* at 9. McIntosh lost sight of the Officers when they walked past the garage just to the south of her home, but she could still hear the Officers saying, "let me see your hands" and a third male

4

voice repeatedly swearing. *Id.* at 30–31. McIntosh did not hear the Officers announce their office and did not realize the men were police officers until she saw them walk past her wearing uniforms.

Spates told IPRA investigators that he also heard a car enter the alley from the north and abruptly stop just to the north of McIntosh's backyard, but he could not see the car. Spates then heard two voices repeatedly saying something to the effect of "put your hands up." Doc. 99 at 9. About five seconds later, Spates heard gunshots firing in rapid succession and said it sounded like two guns firing simultaneously from the Officers' direction. Spates did not hear any other gunfire but after the shooting, he heard a third male voice swearing. Spates also told investigators that the Officers said something to the effect of "put the gun down," but he could not recall the exact words the Officers used. *Id.* at 15. Seconds later, Spates saw the Officers walking south, holding their guns at chest level and saying, "let me see your hands." *Id.* at 7. Spates also did not realize the men were police officers until he saw them walking past the backyard wearing police vests. Spates never saw to whom the Officers spoke or to whom the third male voice belonged.

## II.     The Investigation

Chicago Police Officers Guadalupe Oviedo and Bojan Simic guarded the crime scene at 5834 S. Wabash, including the gun, from approximately 11:10 p.m. on June 2, 2017 until Forensic Investigator Paul Presnell arrived to process the scene at approximately 12:30 a.m. on June 3, 2017. Presnell recovered a Taurus, PT945, .45 semi-automatic handgun from the ground of the alley near 5834 S. Wabash Avenue and inventoried the gun. Presnell photographed the gun and attested that the below photograph fairly and accurately represents the location of the gun when he recovered it.

5



Doc. 83-9 at 6. Presnell also recovered three cartridge cases from the alley near 5834 S. Wabash Avenue, which he inventoried and photographed. Presnell attested that the below photograph fairly and accurately represents the location of the cartridges when he recovered them.



*Id.* at 8. Further, Presnell discovered a bullet hole in the front passenger side bumper of the Officers' car. As Presnell photographed the hole, a bullet fell from it and to the ground; Presnell

inventoried and photographed the bullet. Presnell attested that the below photograph fairly and accurately represents the bullet hole as it appeared to him.



*Id.* at 13. He also attested that the below photograph fairly and accurately represents the bullet at the time he recovered it.



*Id.* at 17.

At 2:15 a.m. on June 3, 2017, Chicago Police Department officers collected samples from Lewis' hands to test for gunshot residue ("GSR"). Mary Wong, an Illinois State Police ("ISP") forensic scientist, later tested those samples and concluded that Lewis "may not have discharged a firearm with either hand" and "[i]f [he] did discharge a firearm, then the particles were not deposited, were removed by activity, or were not detected by the procedure." Doc. 95-1 at 7. Dr. Marta Helenowski, a Cook County medical examiner, conducted an examination of Lewis' body shortly after officers collected the GSR samples and determined that the cause of Lewis' death was two gunshot wounds. She testified that one bullet entered on the left side of his chest and the other entered the lower right portion of his abdomen. Dr. Helenowski further testified that both bullets traveled from front to back, while the bullet that entered Lewis' abdomen also traveled right to left.

Jeanne Hutcherson, an ISP forensic scientist, examined the gun recovered near Lewis and the three cartridge cases recovered from the alley for latent fingerprint impressions suitable for comparison and found none. Hutcherson testified that many factors could prevent latent fingerprint impressions from being suitable for comparison and that "[m]ore often than not[,] [she] do[es] not get suitable latent impressions off of firearms." Doc. 103-4 at 17. Gregory Hickey, another ISP forensic scientist, analyzed the evidence and determined to a reasonable degree of scientific certainty that the three cartridge cases recovered from the alley and the bullet that fell from the Officers' car were fired from the gun recovered near Lewis. Hickey testified that Kurt Murray, another ISP forensic scientist, verified his findings.

**LEGAL STANDARD**

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

8

56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

## ANALYSIS

### I.     Excessive Force Claim

Defendants argue that they are entitled to summary judgment on the Administrator's excessive force claim because the Officers' actions did not violate the Fourth Amendment or, alternatively, because qualified immunity protects the Officers from liability. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *White v. Pauly*, --- U.S. -
---, 137 S. Ct. 548, 551 (2017) (citation omitted) (internal quotation marks omitted). "In other
words, qualified immunity shields from liability [defendants] who act in ways they reasonably
believe to be lawful." *Ewell v. Toney*, 853 F.3d 911, 919 (7th Cir. 2017) (quoting *Jewett v.
Anders*, 521 F.3d 818, 822 (7th Cir. 2008)) (internal quotation marks omitted). Once raised by
the defendant, "a plaintiff must show (1) that the defendant violated a constitutional right, and
(2) that the right was clearly established at the time so that it would have been clear to a
reasonable officer that her conduct was unlawful in the situation." *Id.*

The Fourth Amendment's prohibition on unreasonable seizures limits an officer's use of
deadly force. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To determine the
reasonableness of the use of force, the Court reviews the totality of the circumstances and
"engage[s] in 'a careful balancing of the nature and quality of the intrusion on the individual's
Fourth Amendment interests against the countervailing governmental interests at stake.'"
*Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (quoting *Graham v. Connor*, 490 U.S.
386, 395–96 (1989)). When balancing these competing factors, the Court considers "the facts
and circumstances of each particular case," *id.* (citation omitted), and evaluates reasonableness
from the "perspective of a reasonable officer on the scene," not with "20/20" hindsight, *Graham*,
490 U.S. at 396. In deadly force cases, the Court must "consider[] whether a reasonable officer
in the circumstances would have probable cause to believe that the suspect poses an immediate
threat to the safety of the officers or others." *Sanzone v. Gray*, 884 F.3d 736, 740 (7th Cir.
2018). "If the person of interest threatens the officer with a weapon, deadly force may be used,
because the risk of serious physical harm to the officer has been shown." *King v. Hendricks
Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020). But "[h]aving a weapon is not the same thing

10

as threatening to use a weapon." *Estate of Biegert v. Molitor*, 968 F.3d 693, 700 (7th Cir. 2020). Thus, the "critical consideration" is whether Lewis threatened the Officers with a weapon. *King*, 954 F.3d at 985.

Defendants argue that the circumstances known to the Officers at the time of the shooting made their decision to use deadly force objectively reasonable. Defendants rely on the Officers' testimony that Lewis moved toward them with a gun in his hand, refused their commands to drop the gun, and then raised the gun to point it at them. If the Court accepts this version of events, the Officers' use of deadly force clearly complied with the Fourth Amendment. *See Weinmann*, 787 F.3d at 449–50 ("[I]f [the suspect] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force."); *King*, 954 F.3d at 985 (finding officers reasonably used deadly force when man "pointed a large knife at them, disregarded their repeated commands to drop the knife, and then charged at [an officer]"); *Sanzone*, 884 F.3d at 740 (finding that because the suspect "raised his arm, gun in hand" towards the officers, the officer did not violate the Fourth Amendment by using deadly force).

The Administrator does not offer an alternative version of events. Instead, she argues that the record calls into question the Officers' credibility, and thus, the Court may not grant Defendants summary judgment based on the Officers' testimony. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.").

"To ensure fairness to a deceased plaintiff . . . , given the impossibility of victim testimony to rebut the officers' account, we scrutinize all the evidence to determine whether the officers' story is consistent with other known facts. If physical evidence contradicts the

11

[Officers'] testimony, summary judgment is likely inappropriate." *King*, 954 F.3d at 985; *see also Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994) ("In other words, the court may not simply accept what may be a self-serving account by the police officer. It must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably."). "Nevertheless, the [Administrator] as the party opposing summary judgment retains the burden of presenting evidence that creates a dispute of material fact for a finder of fact to resolve." *Estate of Green v. City of Indianapolis*, 854 F. App'x 740, 746 (7th Cir. 2021); *see Muhammed v. City of Chi.*, 316 F.3d 680, 683–84 (7th Cir. 2002) (asserting that to preclude summary judgment in deadly force case, plaintiff must "provide specific evidence when attacking [officers'] credibility, such as contradictory eyewitness accounts or other impeachment evidence"). Accordingly, the Court proceeds to consider all evidence in the record to determine if it is consistent with the Officers' testimony.

A. **Physical Evidence**

The Administrator first argues that forensic evidence undermines the Officers' testimony that Lewis pointed and fired a gun at them, relying on the fact that investigators did not discover fingerprints on the gun Lewis allegedly held or GSR on his hands. However, "no evidence is no evidence. It is not affirmative evidence that contradicts the [O]fficers' testimony." *King*, 954 F.3d at 986; *see also Logan v. City of South Bend*, --- F. Supp. 3d ----, No. 19-CV-495, 2021 WL 4480679, at *5 (N.D. Ind. Sept. 29, 2021) ("The court proceeds on what evidence exists, not on what doesn't exist."). Specifically, consistent with Hutcherson's testimony, the Seventh Circuit has found that because "successful development of latent prints on firearms is difficult to achieve" and "very few identifiable latent prints are found on firearms," § 1983 plaintiffs in

12

deadly force cases "cannot make anything of the lack of fingerprint evidence." *King*, 954 F.3d at 986 (citation omitted). Wong's equivocal conclusion regarding the lack of GSR on Lewis' hands is similarly uninstructive. *See* Doc. 95-1 at 7 (reporting that Lewis "*may* not have discharged a firearm with either hand" and "[i]f [he] did discharge a firearm, then the particles were not deposited, were removed by activity, or were not detected by the procedure" (emphasis added)); *King*, 954 F.3d at 986 ("[Plaintiff] cannot make anything of the lack of fingerprint evidence: no evidence is no evidence. It is not affirmative evidence that contradicts the [O]fficers' testimony.").

Based on the undisputed facts, the following medical and forensic evidence supports the Officers' testimony that Lewis pointed and fired a gun at them: the two bullets that struck Lewis entered the front side of his body and traveled front to back, indicating that he stood, facing the Officers at the time they shot him; the recovery of a gun and three cartridge cases near Lewis and near where the Officers testified Lewis fired the gun; the bullet recovered from the front bumper of the Officers' car; and Hickey's testimony that the three cartridge cases and bullet were all fired from the gun found near Lewis. No physical evidence conflicts with the Officers' testimony. *Cf. Smith v. Finkley*, 10 F.4th 725, 741 (7th Cir. 2021) (finding material questions of fact existed in deadly force case where "videos reveal[ed] that, in the four seconds before the shooting, [suspect] show[ed] his hands empty with palms out at waist height" and began moving toward the ground in an attempt to surrender in contrast to officers' testimony that suspect threatened or resisted the officers); *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1114–16 (9th Cir. 2016) (reversing grant of summary judgment to defendants in deadly force case where the officers' testimony that the suspect stood upright and swung a baton at the officer when the officer fired "conflict[ed] with the autopsy report and with the video evidence" that indicated that

the bullets entered the suspect's back as he was near the ground with nothing in his hands); *Rios v. City of Chi.*, 523 F. Supp. 3d 1020, 1027–28 (N.D. Ill. 2021) (denying defendants' motion for summary judgment because, based on the wound path evidence tending to show that the first bullet did not hit the suspect while he was pointing a gun at the officer and the lack of clarity provided by the video footage, a reasonable juror could find that the suspect did not point a weapon at the officer in the way the officer testified).

Given the physical evidence that is consistent with the Officers' testimony, it is far too speculative to assert that the lack of fingerprint and GSR evidence contradicts the Officers' testimony that Lewis pointed and fired a gun at them. *See Biegert*, 968 F.3d at 701 ("We must draw inferences in the estate's favor but 'our favor toward the nonmoving party does not extend to drawing [i]nferences that are supported by only speculation or conjecture.'" (alteration in original) (citation omitted)); *King*, 954 F.3d at 986 (affirming grant of summary judgment to defendants and finding "record evidence suggests that [suspect] had a large kitchen knife in his left hand" despite lack of fingerprints on the knife where "after the shooting[,] the knife was collected from the ground to [the suspect's] left" and the "grazing wound to [the suspect's] left arm and the bullet trajectory in his body are consistent with his holding the knife in his left hand"); *Logan*, 2021 WL 4480679, at *8 ("The Estate's argument [regarding a lack of fingerprints on the knife] does nothing more than invite speculation whether [the suspect] was holding the knife, but the law won't permit juries to speculate.").

### B.  Testimonial Evidence

#### i.  The Officers' Testimony

The Administrator next contends that because the Officers contradicted each other regarding details leading up to and immediately following the shooting, the Court cannot rely on

their version of events at the summary judgment stage.  The Administrator describes two portions of the Officers' testimony as contradictory.  First, she argues that the Officers' testimony is inconsistent regarding which Officer saw the gun in Lewis' hand first.  At their depositions in this case, the Officers both testified that Officer Mina saw the gun first and alerted Officer Fuertes to the gun.  Doc. 83-2 at 12; Doc. 83-3 at 16.  Shortly after the shooting, Officer Fuertes told IPRA investigators: "[M]y partner sees the gun first," Doc. 101 at 15, and Officer Mina told IPRA investigators: "I didn't see the gun as, when my partner saw a gun.  I saw the gun as we're approaching them while, uh, driving southbound through the alley," Doc. 100 at 17. While Officer Mina's statement is somewhat unclear in isolation, he later clarified it by saying that once he saw the gun, he "immediately led [his] partner to the gun." *Id.* at 18.  This is consistent with the remainder of the Officers' statements that Officer Mina saw the gun first and alerted Officer Fuertes to the gun, and thus, the Officers do not contradict each other on this point.

Second, the Administrator asserts that the Officers' testimony is inconsistent regarding where they found the gun after the shooting.  Officer Mina told IPRA investigators that the car Lewis crawled toward after the shooting faced the houses, with its rear towards the alley, and that he "s[aw] the weapon behind the rear bumper of the vehicle . . . [m]ore toward the alley." *Id.* at 29.  Officer Fuertes told IPRA investigators that the car faced the houses, to the east, and that he saw the gun "a little bit more, uh, in front of the vehicle, west," close to "where [Lewis] was originally standing."  Doc. 101 at 26.  Again, these statements are consistent.  Although Officer Fuertes used the phrase "in front of" the car and Officer Mina used the phrase "behind the rear bumper," in context, they both clearly testified that they found the gun towards the west of the car, closer to the alley.  The photographs Presnell took of the gun corroborate the Officers'

testimony, depicting the gun near the car's bumper and close to the alley. Thus, "these purported inconsistencies are too slight to raise more than a metaphysical doubt about [the Officers'] veracity." *Estate of Pero v. Cnty. of Ashland*, No. 20-cv-984, 2022 WL 93425, at *14 (W.D. Wis. Jan. 10, 2022) (granting defendant's motion for summary judgment in deadly force case where plaintiff only pointed to minor inconsistencies in the officer's statements regarding the incident but "lack[ed] sufficient evidence from which a reasonable jury could conclude that [the suspect] did not lunge at [the officer] with the knife prior to each gunshot").

The Administrator relies on *Garvin v. Wheeler* in arguing that the inconsistencies in the Officers' testimony combined with the lack of GSR and fingerprint evidence preclude the Court from granting Defendants summary judgment. 304 F.3d 628 (7th Cir. 2002), *overruled on other grounds by Fairley v. Fermaint*, 428 F.3d 897 (7th Cir. 2007). In *Garvin*, although the court considered the lack of fingerprint evidence as one factor that called the officer's credibility into question, as described above, the Seventh Circuit has since determined that a lack of fingerprint evidence is "not affirmative evidence that contradicts the [O]fficers' testimony." *King*, 954 F.3d at 986. Moreover, in *Garvin*, the court relied on many other factors in discrediting the officer's testimony, including that the "entry and exit wounds on [the suspect's] body were inconsistent with [the officer's] description of the shooting" and the story of the officer that used deadly force conflicted with that of the other two officers involved. *Garvin*, 304 F.3d at 634. Here, the medical and forensic evidence is consistent with the Officers' testimony that they shot Lewis as he stood facing and threatening them with a gun. And unlike in *Garvin*, the Administrator does not offer an alternative version of events, or, in other words, does not assert that Lewis did not threaten the Officers with a gun. *See id.* at 630 ("The plaintiffs tell a different story. According to plaintiffs, no struggle ever took place and [the suspect] never drew a gun.").

16

### ii. Testimony of McIntosh and Spates

The Administrator further argues that the testimony of McIntosh and Spates contradicts the Officers' testimony, pointing to two portions of the witnesses' testimony in support. First, McIntosh and Spates testified that they did not hear the Officers announce their office, which the Administrator argues contradicts the Officers' testimony that they announced their office. In response, Defendants point to McIntosh's testimony that she heard the Officers say something that she could not understand before they said, "put the gun down," Doc. 98 at 28, and Spates' testimony that he was unsure of the exact words the Officers used, Doc. 99 at 7, 11, 15. Given that the witnesses could not understand or recall the Officers' exact words, their testimony that they did not hear the Officers announce their office does not contradict the Officers' affirmative testimony that they did announce their office. *See Ybarra v. City of Chi.*, 946 F.3d 975, 980 (7th Cir. 2020) (noting that "[t]o the extent that the [witnesses] could not hear the warnings, their testimony that they 'did not *hear* any warnings fails to present a question of material fact as to whether the giving of the warnings was feasible and if in fact they were given'" where officers positively testified that they gave a warning (quoting *Ford v. Childers*, 855 F.2d 1271, 1276 (7th Cir. 1988))); *Pero*, 2022 WL 93425, at *14 (granting defendants summary judgment in deadly force case and finding that neighbors' testimony that they heard gunshots but no commands from the officer was "not enough to allow a rational trier of fact to decide against [the officer]"). Moreover, whether the Officers gave warnings is not material to this case. *Cf. Ybarra*, 946 F.3d at 980 ("The law requires that before using deadly force *to prevent escape*, the officers must, 'where feasible,' give 'some warning.'" (emphasis added) (citation omitted)).

Second, the Administrator argues that McIntosh's statement that the only gunshots she heard came from the Officers' direction contradicts the Officers' testimony that Lewis shot at

them. Defendants respond by arguing that McIntosh's testimony does not contradict the Officers' testimony because McIntosh testified that the events to the south of her home were harder to hear than those to the north because of the garage located to the south. *See* Doc. 103-2 at 9 ("[E]verything that happens over there on the left is a little harder to hear because of the garage, but on the right side, you know, the hearing is pretty clear."). "[I]f a person testifies that he did not see something, and the undisputed facts show that he had no way to observe it, then the testimony of non-observation is of little to no value. . . . But the converse is also true: if a witness *was* in a position to see or hear something, and did not, then their testimony of not-seeing or not-hearing can be treated as testimony that the thing to be seen did not exist to be seen, or the thing to be heard did not exist to be heard." *Holmes v. Hernandez*, --- F. Supp. 3d ----, No. 14-CV-08536, 2021 WL 4244756, at *9 (N.D. Ill. Sept. 17, 2021) (citations omitted).

The undisputed facts show that a garage obstructed Lewis from McIntosh's view and that there was no garage between McIntosh and the Officers. *See* Doc. 98 at 11 (McIntosh telling IPRA investigators, "There's a garage on -- so we were sitting facing the alley, so there's a garage on the left, but there's no garage on the right."). Thus, McIntosh was in a far better position to see and hear the Officers' actions than to see and hear Lewis' actions and so, her testimony that she only heard gunshots coming from the Officers' direction does not contradict the Officers' testimony that Lewis shot at them. *See Ford*, 855 F.2d at 1276 (finding suspect's testimony that he did not hear the officer's warnings "fails to contradict the officer's positive testimony that he warned [the suspect] twice" where suspect "was wearing both a mask and a hood, which very well could have muffled [his] opportunity to hear the warnings"); *cf. Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1170 (10th Cir. 2020) (finding a genuine dispute of fact existed regarding whether suspect was armed in deadly force case in part because one bystander,

18

"who was within sight of [the suspect] when the shooting began, testified she did not see him shooting a gun or holding his arm out").

Moreover, if anything, what McIntosh heard from the Officers is consistent with the Officers' testimony that Lewis threatened them with a gun—she testified that she heard the Officers repeatedly say "put the gun down" before she heard gunshots. Doc. 98 at 28. McIntosh's testimony therefore does not contradict the Officers' testimony. *Compare Estate of Hollstein v. City of Zion*, No. 17 C 00112, 2019 WL 1619976, at *3–4 (N.D. Ill. Apr. 16, 2019) (granting defendants summary judgment in deadly force case where "the Estate [did] not offer[] any evidence of its own that call[ed] into question the officers' assertions" and "[t]he only other evidence available," video recordings from the officers' equipment that did not provide a clear view of the incident, did not contradict the officers' version of events and "[i]f anything, the audio accompanying the dashcam footage *support[ed]* the officers' accounts"), *with Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1009–10 (E.D. Wis. 2014) (denying defendants' motion for summary judgment in deadly force case where testimony of witness who "was in the next room and could hear what was going on at the time of the shooting" but could not see whether suspect raised knife at deputies, "provide[d] reasons to question the deputies' version of what happened" because her testimony "conflict[ed]" with the deputies' testimony regarding what the suspect said immediately prior to the shooting and how quickly the deputies fired shots after entering the suspect's room).

McIntosh and Spates' testimony also is consistent with the Officers' testimony regarding how the Officers drove into the alley, the location of the incident, and how quickly the events unfolded. In short, the testimony of McIntosh and Spates fails to discredit the Officers' testimony or provide a different version of the events. And as a result, their testimony does not

19

create a genuine issue of material fact. *Cf. Weinmann*, 787 F.3d at 449–51 (upholding denial of summary judgment in excessive force case because of "[t]he existence of a factual dispute about the circumstances surrounding [officer's] decision to fire" where parties' testimonies differed regarding whether suspect pointed the gun at the officer); *Payne*, 337 F.3d at 770 ("Where the parties present two vastly different stories . . . it is almost certain that there are genuine issues of material fact in dispute.").

"Ultimately, we are left with substantial testimonial and physical evidence supporting [the Officers'] version of events, and no concrete evidence rebutting it." *King*, 954 F.3d at 987. The Administrator fails to demonstrate that the record contains sufficient evidence that tends to discredit the Officers' version of events and permit a rational factfinder to find in her favor. Instead, she "offers 'only speculation or conjecture' that raises a 'metaphysical doubt,'" which provides "no job for the factfinder to perform." *Id.* (citation omitted). In other words, the undisputed facts demonstrate that Lewis posed an immediate threat to the Officers, making the Officers' use of deadly force reasonable. *See, e.g.*, *Weinmann*, 787 F.3d at 449–50 ("[I]f [the suspect] had the gun raised to his shoulder and pointed at [the officer], then [the officer] would have been justified in using deadly force."); *Conley-Eaglebear v. Miller*, No. 16-3065, 2017 WL 7116973, at *2 (7th Cir. Sept. 26, 2017) (finding that "[b]ecause [the officer] saw [the suspect] draw a gun and begin to point it in his direction, he acted reasonably under the circumstances" by shooting the suspect).

### C.     Number of Shots Fired

Finally, the Administrator argues that the fact that the Officers shot at Lewis twenty-two times undermines Defendants' argument that the Officers' use of deadly force was reasonable as a matter of law, asserting that "[f]orce becomes increasingly severe the more often it is used."

Doc. 95 at 8. However, the cases the Administrator cites in support of that assertion merely hold that, to comply with the Fourth Amendment, the level of force used by police officers must be proportional to the threat. *See Becker v. Elfreich*, 821 F.3d 920, 928 (7th Cir. 2016) ("Force is reasonable only when exercised in proportion to the threat posed." (citation omitted)); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 525 (7th Cir. 2012) ("But we have never suggested that any level of force is permissible to extinguish such a threat. To the contrary, '[f]orce is reasonable only when exercised in proportion to the threat posed.'" (citations omitted)). Indeed, the Supreme Court has found that "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) (rejecting argument that "even if the use of deadly force was permissible, petitioners acted unreasonably in firing a total of 15 shots").

Here, the Officers testified that they stopped shooting once they lost sight of Lewis and Lewis stopped shooting. McIntosh and Spates' testimony that they only heard gunshots once, firing in rapid succession and lasting only seconds, is consistent with the Officers' testimony. Moreover, Dr. Helenowski testified that only two bullets entered Lewis' body, indicating that a majority of the twenty-two shots fired by the Officers missed their target, failing to eliminate the threat. The Administrator does not offer any evidence that contradicts, or casts doubt upon, the Officers' testimony on this point and, as described above, the Administrator fails to discredit the Officers. Therefore, the undisputed facts demonstrate that the Officers acted reasonably in continuing to shoot at Lewis until he no longer posed a threat. *See, e.g.*, *Esker v. Lutz*, No. 19-cv-00691, 2021 WL 3164254, at *6 (S.D. Ill. July 27, 2021) (granting defendant officer summary judgment where "all shots [were] fired in one quick volley" and "there [was] no evidence that the threat was neutralized" between the officer's second and third shots).

In sum, the Administrator fails to rebut the Officers' testimony and substantial evidence in the record supports the Officers' testimony. Thus, the undisputed facts demonstrate that the Officers acted reasonably in using deadly force and the Court grants summary judgment for the Officers accordingly.[2] *See Biegert*, 968 F.3d at 701 (upholding grant of summary judgment to defendant officers in deadly force case where "no factual issue remained" because plaintiff failed to put forth sufficient evidence to support its version of events); *Sanzone*, 884 F.3d at 740–41 (reversing denial of summary judgment to defendant officers where the record demonstrated that the suspect "threatened the officers when he pointed a gun at them").

## II.    Indemnification Claim

In addition to the excessive force claim, the Administrator seeks indemnification from the City under state law for any judgment entered against the Officers. The Illinois Tort Immunity Act provides that a "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 Ill. Comp. Stat. 10/2-109. Therefore, because the Court finds that the Officers are not liable for Lewis' injuries, it also finds that that the City is not liable and enters summary judgment in its favor. *See Fleming v. Livingston Cnty.*, 674 F.3d 874, 881 (7th Cir. 2012) (upholding grant of summary judgment to sheriff's employer on indemnification claim because sheriff was entitled to summary judgment); *Dempsey v. Nathan*, No. 14 CV 812, 2016 WL 3181682, at *6 (N.D. Ill. June 7, 2016) ("Because we find that Defendant Peluso is not liable, we also grant Defendant Rolling Meadows' motion for summary judgment on the indemnification claims.").

---

[2] Because the Court finds that the Officers acted reasonably and thus did not violate the Constitution, it need not address the parties' arguments remaining arguments regarding qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment

[81]. The Court enters judgment for Defendants and terminates this case.

Dated: March 1, 2022

_____
SARA L. ELLIS
United States District Judge